JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Fred Barnett, Andrew Glover, Jojuan Armour, Jamica Rector and Kywin Supernaw

**DEFENDANTS**
National Football League

**(b)** County of Residence of First Listed Plaintiff   Philadelphia County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   New York County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Fred S Longer, Levin, Fishbein, Sedran & Berman, 510 Walnut St., Suite 500, Philadelphia, PA 19106   215-592-1500

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

X 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | X 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | X 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | X 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | **PRISONER PETITIONS** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | Habeas Corpus: | **IMMIGRATION** | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 530 General | ☐ 462 Naturalization Application | |
| | | ☐ 535 Death Penalty | ☐ 463 Habeas Corpus - Alien Detainee | |
| | | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

## V. ORIGIN (Place an "X" in One Box Only)

X 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332
Brief description of cause:
Negligence, fraud, fraudulent concealment, etc.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ In excess of $75,000
CHECK YES only if demanded in complaint:
JURY DEMAND: X Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE  Anita Brody
DOCKET NUMBER  2:11-05209 and MDL 2323

DATE  2/2/2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #  _____  AMOUNT  _____  APPLYING IFP  _____  JUDGE  _____  MAG. JUDGE  _____

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:     Fred Barnett, 1617 Spruce Street, #300, Philadelphia, PA 19103

Address of Defendant:    National Football League, 345 Park Ave., New York, NY 10017

Place of Accident, Incident or Transaction: The NFL's fraud  originated in New York, but its effect occurred wherever the plaintiffs' played.
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))        Yes☐    No☒

Does this case involve multidistrict litigation possibilities?        Yes☒    No☐

*RELATED CASE, IF ANY:*

Case Number:  2:11-05209 and MDL 2323        Judge  Anita Brody        Date Terminated:  ongoing

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
        Yes☐    No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
        Yes☒    No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?        Yes☐    No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
        Yes☐    No☒

---

**CIVIL: (Place ✔ in ONE CATEGORY ONLY)**

**A.** *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify)

**B.** *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☒ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) Negligence, fraud, etc.

---

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I,     Fred S. Longer                    , counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE:   February 2, 2012                                                                      46653
                        Attorney-at-Law                                        Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

---

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____        _____        46653
                        Attorney-at-Law                        Attorney I.D.#

CIV. 609 (6/08)

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:     Fred Barnett, 1617 Spruce Street, #300, Philadelphia, PA 19103

Address of Defendant:   National Football League, 345 Park Ave., New York, NY 10017

Place of Accident, Incident or Transaction: The NFL's fraud  originated in New York, but its effect occurred wherever the plaintiffs' played.

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?    Yes ☐   No ☒

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))

Does this case involve multidistrict litigation possibilities?    Yes ☒   No ☐

*RELATED CASE, IF ANY:*

Case Number:  2:11-05209 and MDL 2323     Judge   Anita Brody     Date Terminated:  ongoing

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☒   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?    Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐   No ☒

---

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

**A.** *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (Please specify)

**B.** *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☒ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) Negligence, fraud, etc.

## ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I,     Fred S. Longer                  , counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

**DATE:**  February 2, 2012                              _____                    46653
                                                               Attorney-at-Law                              Attorney I.D.#

**NOTE:**  A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

---

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

**DATE:** _____        _____                    46653
                                              Attorney-at-Law                              Attorney I.D.#

CIV. 609 (6/08)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | |
|---|---|
| Fred Barnett, Andrew Glover, Jojuan Armour, Jamaica Rector and Kywin Supernaw | : CIVIL ACTION No. |
| | : |
| | : |
| v. | : |
| | : |
| National Football League | : |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a)  Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.   ( )

(b)  Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.   ( )

(c)  Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d)  Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.   ( )

(e)  Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.)   ( X )

(f)  Standard Management – Cases that do not fall into any one of the other tracks.   ( )


| | | |
|---|---|---|
| February 2, 2012 | Fred S. Longer | Plaintiffs |
| Date | Attorney-at-law | Attorney for |
| | | |
| 215-592-1500 | 215-592-4663 | FLonger@lfsblaw.com |
| Telephone | FAX Number | E-Mail Address |

(Civ. 660) 10/02

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | | |
|---|---|---|
| Fred Barnett, et al | ) | |
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| National Football League | ) | |
| _____ | ) | |
| *Defendant* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   National Football League
345 Park 'Avenue
New York, NY 10017

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     Fred S. Longer, Esquire
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Ste. 500
Philadelphia, PA 19106

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Michael E. Kunz*
*Clerk of Court*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

    ❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____; or

    ❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____, a person of suitable age and discretion who resides there,

on *(date)* _____, and mailed a copy to the individual's last known address; or

    ❒ I served the summons on *(name of individual)* _____, who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____; or

    ❒ I returned the summons unexecuted because _____; or

    ❒ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

                               _____
                                            *Server's signature*

                               _____
                                            *Printed name and title*

                               _____
                                            *Server's address*

Additional information regarding attempted service, etc:

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRED BARNETT, ANDREW GLOVER, JOJUAN ARMOUR, JAMAICA RECTOR, and KYWIN SUPERNAW,<br><br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL FOOTBALL LEAGUE,<br><br><br>Defendant. | Civil Action No:<br><br><br><br><br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Fred Barnett, Andrew Glover, Jojuan Armour, Jamaica Rector, and Kywin Supernaw, as and for a cause of action against the Defendant, allege, upon information and belief, as follows:

## INTRODUCTION

1.     The National Football League ("NFL" or "the League") is America's most successful and popular sports league. With 32 member teams, the league is a multi-billion dollar business. With so much money at stake, the NFL is and has always been eager to avoid negative publicity and protect the product on the field. As a result, the NFL regulates just about everything as it pertains to their teams. The NFL regulates league policies, player appearance, marketing, and safety, among other items.

2.     Football is unquestionably a tough, aggressive, physically demanding sport. Injuries are common. As such, it is vital to the safety of the players that the NFL act reasonably, through research, studies and other means, to identify the risks of serious injury associated with playing professional football, to keep the teams and players informed of the risks that they

identify and to take reasonable steps based upon their findings to protect their players.  Aware of this responsibility, the NFL, through its own initiative created the Mild Traumatic Brain Injury ("MTBI") Committee in 1994 to research and presumably look to ameliorate what was already a tremendous problem in the league – concussions.

3.      The rash of head injuries has been noted in a wide variety of news articles and television segments, and was addressed recently by the league in an announcement that it would clamp down on illegal blows to the head.  But, as previously alluded to, this spate of head injuries is not a new problem at all.  For decades, the league's players have been plagued by the devastating effects of concussions.

4.      Despite overwhelming medical evidence that on field concussions led directly to brain injuries and frequently had tragic repercussions for their retired players, the NFL not only failed to take effective action in an attempt to protect players from suffering a similar fate, but reprehensibly failed to inform players of the true risks associated with concussions, instead misrepresenting and/or concealing medical evidence on the issue through its "hand-picked" committee of unqualified physicians who were purportedly researching same.  While athletes in other professional sports who had suffered concussions were being effectively "shut down" for long periods of time or full seasons, NFL protocol was to return players who had suffered concussions *that very game.*

5.      Simply put, the NFL has not taken an issue that requires the utmost attention very seriously.  Wanting their players on the field instead of training tables, and in an attempt to protect a multi-billion dollar business, the NFL has purposefully attempted to obfuscate the issue and has repeatedly refuted the connection between concussions and brain injury to the disgust of Congress, which has blasted the NFL's handling of the issue on multiple occasions, and expert

neurologists who know the score.   The unfortunate reality is that in the 17 years since its formation, the MTBI has served as nothing short of a roadblock to any real attempt to protect NFL players from concussions and resultant brain injury.   In fact, the committee's concealment and misrepresentation of relevant medical and study information over the years has caused an increased risk of life-threatening injury to players who were being kept in the dark.

6.      At the end of the day, the NFL has not only failed to satisfy its duty to take reasonable steps necessary to protect players from devastating head injuries, they have done everything in their power to hide the issue and mislead their players concerning the risks associated with concussions.

## THE PARTIES

7.      At the time of the commencement of this action, Plaintiff Fred Barnett is a citizen of the State of Pennsylvania.   Plaintiff Barnett played for the Philadelphia Eagles and Miami Dolphins, both NFL member clubs.

8.      At the time of the commencement of this action, Plaintiff Andrew Glover is a citizen of the State of Texas.   Plaintiff Glover played for the NFL member clubs Los Angeles Raiders, Minnesota Vikings, New Orleans Saints, and Oakland Raiders.

9.      At the time of the commencement of this action, Plaintiff Jojuan Armour is a citizen of the State of Ohio.   Plaintiff Armour played for the NFL member club Cincinnati Bengals.

10.      At the time of the commencement of this action, Plaintiff Jamaica Rector is a citizen of the State of Texas.   Plaintiff Rector played for the Dallas Cowboys and Arizona Cardinals, both NFL member clubs.

11.    At the time of the commencement of this action, Plaintiff Kywin Supernaw is a citizen of the State of Indiana.  Plaintiff Supernaw played for the NFL member club Detroit Lions.

12.    Defendant National Football League is a nonprofit, non-incorporated entity organized and existing under the laws of the State of New York, with its principal place of business at 345 Park Ave., New York, NY 10017.  The National Football League is not, and has not, been the employer of Plaintiffs, who were employed by independent clubs, named above, during their respective careers in professional football.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as there is diversity of citizenship and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

14.    This Court has personal jurisdiction over Defendant because it does business in Pennsylvania, has two franchises which play in Pennsylvania, and derives substantial revenue from its contacts with Pennsylvania.

15.    Venue properly lies in this district pursuant to 28 U.S.C. § 1391(a)(2) and 1391(b)(2) as a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this jurisdiction and the Defendant conducts substantial business in this jurisdiction.

## ALLEGATIONS APPLICABLE TO ALL COUNTS

## THE NATIONAL FOOTBALL LEAGUE

16.     The NFL oversees America's most popular spectator sport, football, and acts as a trade association for 32 franchise owners.  The NFL is currently comprised of 32 teams.  The NFL's average attendance per game was 67,509 in 2009.

17.     The NFL governs and promotes the game of football, sets and enforces rules and league policies, and regulates team ownership.  It generates revenue mostly through marketing sponsorships, licensing merchandise, and by selling national broadcasting rights to the games. The teams share a percentage of the league's overall revenue.  Founded in 1920 as the American Professional Football Association, the league has been known as the NFL since 1922.

18.     NFL league revenues far exceed any other sports league.  Frequently surpassing $7 billion annually, the NFL experienced its third most profitable year ever in 2008, earning some $7.6 billion.

19.     A *Forbes* magazine article recently stated that 19 NFL franchises are worth $1 billion or more.  Even the lowest-valued of the 32 NFL teams is worth approximately $800 million.  Over the last 15 years, the values of franchises in the NFL have gone up 500 percent.

20.     According to a recent Wall Street Journal Article, the NFL has spent nearly $5.5 on lobbying firms since 2006, tripling its lobbying expenses over the previous four years.  The lobbying firms "address a host of issues from player concussions to Internet gambling to cable and satellite television matters and labor issues."

21.     Owing in part to its immense financial power and monopoly status in American football, the NFL has assumed enormous influence over the research and education of football injuries to physicians, trainers, coaches, and amateur football players at all levels of the game.

22.     Indeed, the website www.nflhealthandsafety.com states that USA Football, the sport's national governing body, "is the Official Youth Football Development Partner of the NFL and the NFL Players Association.   The independent non-profit organization leads the development of youth, high school and international amateur football.  In addition, USA Football operates programs and builds resources to address key health and safety issues in partnership with leading medical organizations.  The organization was endowed by the NFL and NFLPA through the NFL Youth Football Fund in 2002.  USA Football stands among the leaders in youth sports concussion education, particularly for football."

## THE NATURE OF HEAD INJURIES SUFFERED BY NFL PLAYERS

23.     The American Association of Neurological Surgeons defines a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."

24.     The injury generally occurs when the head either accelerates rapidly and then is stopped, or is spun rapidly.  The results frequently include confusion, blurred vision, memory loss, nausea and, sometimes, unconsciousness.

25.     Dr. Wise Young, a neurosurgery professor at New York University, described concussions as follows: "Picture your brain as a hunk of Jell-O floating in a bowl - your cranium. When you get hit in the head, the bowl suddenly shifts and the Jell-O bangs against the side, then rebounds and bangs against the other side.  At the same time, the Jell-O is twisted and wrenched. This smashing, jiggling and torquing of the brain causes strains and tears, snapping blood vessels, killing brain cells (neurons) and shearing the delicate connections (axons) that link this

incredibly complex cerebral telephone system." Further, "[w]hen somebody is severely injured, you see breaks of the axons and nerve fibers all over the brain."

26.     Medical evidence has shown that symptoms of a concussion can reappear hours or days after the injury, indicating that the injured party had not healed from the initial blow.

27.     According to neurologists, once a person suffers a concussion, he is as much as four times more likely to sustain a second one. Additionally, after several concussions, a lesser blow may cause the injury, and the injured player requires more time to recover.

28.     Clinical and neuropathological studies by some of the nation's foremost experts demonstrate that multiple concussions sustained during an NFL player's career cause severe cognitive problems such as depression and early-onset dementia.

29.     Chronic Traumatic Encephalopathy ("CTE") is a progressive degenerative disease of the brain found in athletes (and others) with a history of repetitive concussions. Conclusive studies have shown this condition to be prevalent in retired professional football players who have a history of head injury.

30.     This head trauma, which includes multiple concussions, triggers progressive degeneration of the brain tissue. These changes in the brain can begin months, years, or even decades after the last concussion or end of active athletic involvement. The brain degeneration is associated with memory loss, confusion, impaired judgment, paranoia, impulse control problems, aggression, depression, and, eventually, progressive dementia.

31.     Not surprisingly, The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a clear correlation between NFL football and depression, dementia and other cognitive impairment.

32.     To date, neuroanatomists have performed autopsies on 13 former NFL players who died after exhibiting signs of degenerative brain disease.  Twelve of these players were found to have suffered from CTE.

## THE NFL'S DEFICIENT RESPONSES TO THE CONCUSSION ISSUE

33.     The NFL's concussion problem is not new.  In 1994, following the well-publicized retirements of NFL players Al Toon and Merrill Hoge, both of whom had sustained serious head injuries while playing and developed post concussion syndrome, then-NFL Commissioner Paul Tagliabue established the Mild Traumatic Brain Injury ("MTBI") Committee to study, among other things, post concussion syndrome in NFL players.

34.     The NFL affirmatively assumed a duty to use reasonable care in the study of post concussion syndrome, and to use reasonable care in the publication of data from the MTBI Committee's work.

35.     Rather than exercising reasonable care in these duties, the NFL immediately engaged in a long-running course of negligent conduct.

36.     Instead of naming a noted neurologist to chair the newly formed committee or, at least, a physician with extensive training and experience treating head injuries, Tagliabue appointed a puppet, Dr. Elliot Pellman, to this post.

37.     Dr. Pellman, a rheumatologist with training in the treatment of joints and muscles, not head injuries, would go on to chair the MTBI Committee from 1994 to 2007.  Dr. Pellman's leadership of this committee came under frequent harsh criticism for his deficient medical training, background, and experience to head the committee and lead its research efforts, not to mention his bias.

8

38.     By 1994, when the NFL's committee was formed, scientists and neurologists alike were already convinced that all concussions - even seemingly mild ones – were serious injuries that permanently damage the brain, impair thinking ability and memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently.

39.     The NFL's team of hand-picked experts had a different take on the issue, however.   They did not find concussions to be of significant concern and felt it more than appropriate for players suffering a concussion to continue playing football during the same game in which one was suffered.

40.     When asked in or about 2005 about his history of concussions, San Francisco 49ers Quarterback Steve Young admitted to six "official" concussions.   His definition of an official concussion:  "When you're lying on your back and they cart you off.   That's an 'official' concussion."

41.     With the NFL "party line" in place minimizing the significance of concussions, players who suffered them were told not to be overly concerned, and were regularly returned to game action mere minutes after sustaining them.

42.     The NFL's practice, set in motion by the MTBI Committee, was irresponsible and dangerous.   A noted neurologist, Dr. Dennis Choi, a professor and head of neurology at Washington University in St. Louis discussed in 2005 his opinion that the most pernicious concussions are those that occur before earlier concussions have healed.   "The brain has a wonderful ability to partially heal itself," said Dr. Choi, but "[i]f you take another shot before healing has taken place, the chances of compounding the injury are very real."

43.     In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina in Chapel Hill conducted a study involving 18,000 collegiate and

high school football players.  The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season following the initial concussion.

44.     A 2000 study, which surveyed 1,090 former NFL players, found that more than 60 percent had suffered at least one concussion, and 26 percent had suffered three or more, during their careers.  Those who had sustained concussions reported more problems with memory, concentration, speech impediments, headaches and other neurological problems than those who had not been concussed.

45.     The MTBI Committee has published multiple research articles since its inception. The findings of the committee have regularly contradicted the research and experiences of neurologists who treat sports concussions, and to players who endured them.

46.     For example, in the October 2004 edition of *Neurosurgery*, the MTBI Committee published a paper in which it asserted that the Committee's research found no risk of repeated concussions in players with previous concussions and that there was no "7- to 10-day window of increased susceptibility to sustaining another concussion."

47.     In a comment to the study published in *Neurosurgery*, one doctor wrote that "[t]he article sends a message that it is acceptable to return players while still symptomatic, which contradicts literature published over the past twenty years suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days."

48.     For further example, in January 2005 the Committee wrote that returning to play after a concussion "does not involve significant risk of a second injury either in the same game or during the season."  However, a 2003 NCAA study of 2,905 college football players found

just the opposite: Those who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury."

49.     In 2005, Dr. Bennet Omalu, at the time a Pittsburgh-area pathologist, studied the brain of former NFL player Mike Webster, who had recently committed suicide. Dr. Omalu determined that Webster suffered from CTE, and published his findings in the June 2005 edition of *Neurosurgery*. Three members of the NFL's MTBI Committee—Drs. Pellman, Viano, and Casson—attacked the article and said they wanted it retracted.

50.     Dr. Julian Bailes, a neurosurgeon from West Virginia University, briefed the NFL Committee on the findings of Dr. Omalu and other independent studies linking multiple NFL head injuries with cognitive decline. Dr. Bailes recalled the MTBI Committee's reaction to his presentation: "the Committee got mad ... we got into it. And I'm thinking, 'This is a ... disease in America's most popular sport and how are its leaders responding? Alienate the scientist who found it? Refuse to accept the science coming from him?'"

51.     In November 2006, Dr. Omalu studied the brain of former NFL player Andre Waters, who had died of a self-inflicted gunshot wound. The analysis of Waters' brain tissue conducted by Dr. Omalu showed signs of CTE.

52.     A November 2006 *ESPN The Magazine* article described how the MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players when studying the effects of concussions on the results of such tests. The article further revealed that Dr. Pellman had fired a neuropsychologist for the New York Jets, Dr. William Barr, after Dr. Barr voiced concern that Dr. Pellman might be picking and choosing what data to include in the committee's research to get results that would downplay the effects of concussions.

53.     Dr. Pellman stepped down as the head of the MTBI Committee in February 2007.
Dr. Kevin Guskiewicz, research director of UNC's Center for the Study of Retired Athletes, said
at the time that Dr. Pellman was "the wrong person to chair the committee from a scientific
perspective and the right person from the league's perspective."

54.     Regarding the work of Dr. Pellman, Dr. Guskiewicz stated, "[w]e found this at the
high school level, the college level and the professional level, that once you had a concussion or
two you are at increased risk for future concussions;" but "[Dr. Pellman] continued to say on the
record that's not what they find and there's no truth to it."

55.     Dr. Pellman was replaced by Doctors Ira Casson and David Vaino.  Dr. Casson
continued to dismiss outside studies and overwhelming evidence linking dementia and other
cognitive decline to brain injuries.  When asked in 2007 whether concussions could lead to brain
damage, dementia or depression, Dr. Casson denied the linkage six separate times.

56.     In June, 2007, the NFL convened a concussion summit for team doctors and
trainers.  At the summit, the co-chair of the MTBI Committee, Dr. Ira Casson, told team doctors
and trainers that CTE has never been scientifically documented in football players.

57.     In August, 2007, the NFL issued a concussion pamphlet to players.  Independent
scientists and neurologists were disgusted and dismayed when the following statement appeared
in the pamphlet: "current research with professional athletes *has not shown* that having more
than one or two concussions leads to permanent problems if each injury is managed properly.  It
is important to understand that there is no magic number for how many concussions is too
many."

58.     The concussion pamphlet clearly created player reliance.  "We want to make sure
all NFL players...*are fully informed* and take advantage of the *most up to date information* and

resources as we continue to study the long-term impact on concussions." (Emphasis added). Evidently, the "most up to date information" did not include the findings of Doctors Guskiewicz, Cantu, Omalu and Bailes indicating a causal link between multiple concussions and later life cognitive decline.

59.     In 2008, the University of Michigan's Institute for Social Research conducted a study on the health of retired players, with over 1,000 former NFL players taking part. The results of the study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population – including a rate of 19 times the normal rate for men ages 30 through 49."

60.     The NFL, which had commissioned the study, responded to its results by claiming that the study was incomplete. Further findings, it said, would be needed. Several experts in the field found the NFL's reaction to be "bizarre," noting that "they paid for the study, yet they tried to distance themselves from it."

61.     Shortly after the results from this study were released, Representative John Conyers, Jr., chairman of the House Judiciary Committee, called for hearings on the impact of head injuries sustained by NFL players.

62.     In the first hearing, in October 2009, Rep. Maxine Waters stated, "I believe you are an $8 billion organization that has failed in your responsibility to the players. We all know it's a dangerous sport. Players are always going to get injured. The only question is, are you going to pay for it? I know that you dearly want to hold on to your profits. I think it's the responsibility of Congress to look at your antitrust exemption and take it away."

63.     NFL Commissioner Roger Goodell testified at the hearing.  He stated that "[w]e are fortunate to be the most popular spectator sport in America.  In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football each year; more than one million high school players also do so and nearly seventy five thousand collegiate players as well.  We must act in their best interests even if these young men never play professional football."

64.     Goodell testified that "[i]n the past 15 years, the N.F.L. has made significant investments in medical and biomechanical research.  All of that information has been made public, subjected to thorough and on-going peer review, published in leading journals, and distributed to the N.F.L.P.A. and their medical consultants.  We have been open and transparent, and have invited dialogue throughout the medical community."

65.     Also in the October hearing, NFLPA Executive Director DeMaurice Smith stated that the study was not the first study on this issue.  "While this is the first N.F.L.-accepted study that demonstrated a connection between on-field injury and post career mental illness, there have been studies over the last decade highlighting that fact.  Unfortunately, the N.F.L. has diminished those studies, urged the suppression of the findings and for years, moved slowly in an area where speed should have been the impetus."

66.     After the congressional hearings, the NFLPA called for the removal of Dr. Casson as MTBI co-chair.  "Our view is that he's a polarizing figure on this issue, and the players certainly don't feel like he can be an impartial party on this subject," said NFLPA assistant executive director George Atallah.

67.     Dr. Casson and Dr. David Viano resigned as co-committee chairmen after the 2009 congressional hearings.  Dr. Casson, as noted, came under criticism during the hearings for

14

his "continued denials of any link among retired players between injuries sustained in professional football and heightened rates of dementia."

68.     Shortly after the October 2009 hearings, the NFL announced that it would impose its most stringent rules to date on managing concussions, requiring players who exhibit any significant sign of concussion to be removed from a game or practice and be barred from returning the same day.  The league's former practice of allowing players to return when their concussion symptoms subside, a practice experienced by each and every Plaintiff, has been soundly criticized for putting its players at risk.

69.     In the apparent change in policy, the NFL indicated that "independent experts" would decide who returns to play and who has to sit out so their brain can heal.  Not surprisingly, the "independent experts," were selected by Dr. Pellman.

70.     The change contradicted past recommendations by the Committee, which had recommended as safe the league's practice of returning players after concussion.  The committee had published a paper in the journal *Neurosurgery* in 2005 that stated "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play.  Return to play does not involve a significant risk of a second injury either in the same game or during the season."

71.     In December 2009, an NFL Spokesman stated that it was "quite obvious from the medical research that's been done that concussions can lead to long-term problems."  This fact had been quite obvious to virtually every person involved in the study of concussions for more than a decade with the exception of the NFL and its so called "experts."

72.     On December 17, 2009, Cincinnati Bengals wide receiver Chris Henry, 26, died after falling from the back of a pickup truck.   Doctors Omalu and Bailes performed a postmortem study on Henry's brain and diagnosed Henry with CTE.

73.     In January 2010, the House Judiciary Committee held further hearings on Football Player Head Injuries.   The committee chairman, Rep. John Conyers, Jr., noted that "until recently, the NFL had minimized and disputed evidence linking head injuries to mental impairment in the future."

74.     Dr. Casson provided oral and written testimony at the January 2010 hearings.   He continued to deny the validity of other studies, stating that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

75.     Rep. Linda Sanchez soundly criticized the NFL at the hearings.   "I find it really ridiculous that he's saying that concussions don't cause long-term cognitive problems.   I think most people you ask on the street would figure that repeated blows to the head aren't good for you."   She further commented that "It seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years.   Why did it take 15 years?"

76.     In 2010, the NFL re-named the panel, to the "Head, Neck, and Spine Medical Committee" and announced that Dr. Pellman would no longer be a member of the panel.   Drs. H. Hunt Batjer and Richard G. Ellenbogen were selected to replace Drs. Casson and Viano.   The two new co-chairmen selected Dr. Mitchel S. Berger to serve on the committee.

77.     Under its new leadership, the Committee admitted that data collected by the NFL's former brain-injury leadership was "infected," said that their committee should be assembled anew.   Attempting to distance itself from the prior regime, the new Committee

formally requested that the group's former chairman, Dr. Elliot Pellman, not speak at one of their initial conferences.

78.     During a May 2010 Congressional hearing, Congressman Anthony Weiner addressed Drs. Batjer and Ellenbogen with the following comment: "you have years of an infected system here, and your job is…to mop [it] up." Step one should have been for the NFL's committee to issue an adequate warning to league players about the causal link between multiple NFL concussions and cognitive decline.  At one juncture during the Congressional hearing, Rep. Weiner, infuriated by the answers he was being given by Ellenbogen chided, "You're in charge of the brains of these players!"

79.     Shortly after the May 2010 hearing, Dr. Batjer was quoted as saying, "[w]e all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable by any modern standards or not acceptable to us.  I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

80.     The NFL continued its deficient response to head injuries as the 2010 season began, and the league's concussion woes continued.  In an early season game in 2010, when Eagles middle linebacker Stewart Bradley was injured, staggered onto the field and stumbled over, it was clear he was injured.

81.     Troy Aikman, the former Cowboys quarterback who had suffered multiple concussions and was analyzing the game on television, commented that "[i]t's hard to imagine him coming back into this game in light of what we just saw."  But after about four minutes of real time, the Eagles sent Bradley back on the field.  Bradley was soon removed from the game, this time diagnosed with a concussion.

82.     In the same game, Eagles Quarterback Kevin Kolb was also sidelined by a concussion. He, too, was initially cleared to play and briefly returned to the game.

83.     Recently, when legendary New York Giants Linebacker Harry Carson was asked about the concussion issue, he was quoted as saying: "Physically, I have aches and pains, but that comes with playing the game. But if somebody tells you neurologically you could sustain some kind of brain damage that will go with you the rest of your life. If somebody had told me that a long time ago, I don't frankly think I would have [played]."

84.     After some 16 years of essentially ignoring the issue, it appears as though the NFL has only very recently begun to take the concussion issue seriously. On October 20, 2010, in the wake of a series of dangerous and flagrant hits resulting in concussions, the NFL levied fines totaling $175,000 on three players, James Harrison, Brandon Meriweather and Duanta Robinson.

85.     In discussing Meriweather's helmet to helmet hit on Baltimore Ravens Tight End Todd Heap, NFL Executive Vice President of Football Operations Ray Anderson was quoted as saying that "in our view, the hit was flagrant and egregious. *Effective immediately*, that's going to be looked at at a very aggressive level, which would include suspension without pay…What I would tell you is that if there are flagrant and egregious violations of our current rules, we will be enforcing, *effective immediately*, discipline at a higher level." (Emphasis added).

86.     That same day, NFL Commissioner Roger Goodell forwarded a memo to all 32 NFL teams with a message that was to be read to all players and coaches. Also forwarded to each team was a video showing "what kinds of hits are against the rules."

87.     Goodell's memo provided in part that "violations of the playing rules that unreasonably put the safety of another player in jeopardy have no place in the game, and that is

18

especially true in the case of hits to the head and neck.  Accordingly, from this point forward, you should be clear on the following points: (1) Players are expected to play within the rules. Those who do not will face increased discipline, including suspensions, starting with the first offense; (2) Coaches are expected to teach playing within the rules.  Failure to do so will subject both the coach and the employing club to discipline; (3) Game officials have been directed to emphasize protecting players from illegal and dangerous hits, and particularly from hits to the head and neck.  In appropriate cases, they have the authority to eject players from a game."

88.     Two days later, a second memo was sent out to all teams by Ray Anderson providing each coach with the names of only his own players who have multiple infractions.  As NFL Spokesman Greg Aiello provided, "the purpose was to provide an opportunity for the coach to give extra caution to those players to abide by the safety rules."

89.     On February 17, 2011, former Chicago Bears and New York Giants player Dave Duerson committed suicide.  Only 50 at the time of his death, Duerson had suffered months of headaches, blurred vision, and faltering memory.  After his death, Boston University researchers determined that Duerson was suffering from CTE.

90.     In October 2011, Dr. Berger of the Head, Neck, and Spine Medical Committee announced that a new study was in the planning process.  Addressing problems with the previous long-range study, a New York Times article noted that Dr. Berger said "There was no science in that."  Dr. Berger further state that data from the previous study would not be used.  "We're really moving on from that data.  There's really nothing we can do with that data in terms of how it was collected and assessed."

91.     In November 2011, the league's injury and safety panel issued a directive telling its game officials to watch closely for concussion symptoms in players.  The directive came 10

days after San Diego guard Kris Dielman sustained a head injury against the Jets and later had a grand mal seizure on the team's flight home. Dielman sustained a head injury during a game on Oct. 23, finished playing in the game, and was not assessed until afterward.

92.     Following a decade and a half of burying its head in the sand, the first serious actions taken to address the rampant concussion problem in the league has already had positive effects. NFL Officiating Chief Carl Johnson was quoted on NBC's "Football Night in America," stating that he's "seen a change in players' behavior in one week."

93.     Why league policy changes, accurate information sharing, strict fines and warnings of this nature were not recommended by the NFL's so called "expert" committee soon after its creation in 1994 is difficult to comprehend. That it took 16 years to admit that there was a problem and to take any real action to address same, is willful and wanton and exhibits a reckless disregard for the safety of their players.

## **PLAINTIFFS' INJURIES**

94.     Plaintiff Fred Barnett was drafted by the Philadelphia Eagles in the 1990 NFL draft. He played for the Philadelphia Eagles for six seasons, and for the Miami Dolphins for two seasons. Plaintiff suffered multiple concussions while playing in the NFL.

95.     Since he retired from the NFL, Plaintiff suffers from headaches, difficulty sleeping, dizziness, and chronic neck and lower back pain.

96.     At no time after suffering a concussion was Plaintiff warned about the dangers of returning to action too quickly. Nor was Plaintiff warned about the risk of long-term injury due to football-related concussions. This lack of warnings was a substantial factor in causing his current injuries.

97. Plaintiff Andrew Glover was drafted by the Los Angeles Raiders in the NFL Draft, and also played for the Oakland Raiders, the Minnesota Vikings, and the New Orleans Saints during his ten year NFL career. Plaintiff suffered multiple concussions while playing in the NFL.

98. Since he retired from the NFL, Plaintiff has suffered from memory loss and headaches, which has adversely impacted his ability to work.

99. At no time after suffering a concussion was Plaintiff warned about the dangers of returning to action too quickly. Nor was Plaintiff warned about the risk of long-term injury due to football-related concussions. This lack of warnings was a substantial factor in causing his current injuries.

100. Plaintiff Jojuan Armor was selected by the Oakland Raiders in the 1999 NFL draft. He played for the Cincinnati Bengals from 1999-2002. Plaintiff suffered at least three concussions during his NFL career.

101. Since he retired from the NFL, Plaintiff suffers from memory loss, headaches, and light sensitivity.

102. At no time after suffering any concussion was Plaintiff warned about the dangers of returning to action too quickly. Nor was Plaintiff warned about the risk of long-term injury due to football related concussions. This lack of warnings was a substantial factor in causing his current injuries.

103. Plaintiff Jamaica Rector was signed as an undrafted free agent by the Dallas Cowboys in 2005. He played for the Cowboys and the Arizona Cardinals. During his playing career, he suffered concussions.

104. Since his retirement, he has suffered from memory loss, panic attacks, and headaches.

105. At no time after suffering a concussion was Plaintiff warned about the dangers of returning to action too quickly. Nor was Plaintiff warned about the risk of long-term injury due to football-related concussions. This lack of warnings was a substantial factor in causing his current injuries.

106. Plaintiff Kywin Supernaw played four seasons for the Detroit Lions. During his NFL career, he suffered concussions.

107. Since his retirement, he has suffered from headaches and mood swings.

108. At no time after suffering a concussion was Plaintiff warned about the dangers of returning to action too quickly. Nor was Plaintiff warned about the risk of long-term injury due to football-related concussions. This lack of warnings was a substantial factor in causing his current injuries.

109. In addition to the misrepresentations and failures to warn Plaintiffs of the dangers of head injuries, as described above, the NFL failed to ensure that risks were minimized. As part of Defendant's duty to warn the players of the dangers of concussions, Defendant was required to ensure that conditions did not exacerbate Plaintiffs' risks of injury.

110. Defendant failed to do this. Each Plaintiff, during his playing career, received either intravenous injections of the drug Toradol (Ketorolac Tromethamine) or oral Toradol prior to playing in NFL games. Toradol is a nonsteroidal anti-inflammatory drug ("NSAID"). It works by reducing hormones that cause inflammation and pain in the body. Toradol is a potent analgesic in its intramuscular form. In short, the drug can mask pain.

111.    A study published in 2002 regarding Toradol use in the NFL noted that "there are risks associated with Toradol and other NSAIDs that must be discussed with every athlete prior to use."

112.    The Toradol label states that "Toradol inhibits platelet function and is therefore, CONTRAINDICATED in patients ... at high risk of bleeding."

113.    Toradol is not to be used if the recipient has a closed head injury or bleeding in the brain.  "The bleeding risk of Toradol is an utmost concern in collision sports such as football. Even a small increase in bleeding risk can exacerbate high-risk injuries such as concussions, spinal cord, spleen, and kidney trauma."

114.    The Powell study noted that "most teams did not routinely follow bleeding times and platelet function."

115.    Plaintiffs received no warnings regarding the use of Toradol as it pertained to head injuries and were further at risk because Toradol's pain masking features can prevent the feeling of injury.

116.    Plaintiffs were also at an increased risk of suffering even greater damages due to concussions because of Toradol's blood thinning effect.

117.    In some instances, Plaintiffs received the Toradol shots without reporting any injury prior to the Toradol use, with large groups of other players who also received the shots. Plaintiffs have described the situation as one of being in a pre-game locker room with players lining up to receive injections of Toradol in a "cattle call" with no warnings of any sort being given, no distinguishing between different medical conditions of the players, and regardless of whether the player had an injury of any kind.

118.    Plaintiffs were thus medicated without proper warnings, without proper consent, and without knowledge of the risks posed by the use of Toradol.

119.    The applicable statute of limitations is tolled because Defendant's fraudulent concealment of the dangers and adverse effects of head injuries made it impossible for Plaintiffs to learn of the hazards to their health.

120.    Plaintiffs did not become reasonably aware of the dangerous nature of, and the unreasonable adverse side effects associated with, nor establish any provable compensable damages caused by, their head injuries prior to two years to the date of this Complaint.  The accrual of a complete cause of action relating to the cognizable physical manifestation of the injury did not exist until that time.

121.    Defendant was under a continuing duty to disclose the true character, quality, and nature of the after effects of head injuries.  Because of Defendant's concealment of the true character, quality and nature of these injuries, Defendant is estopped from relying on any statute of limitations defense.

122.    Defendant, in the course of its business, omitted material key facts about the effects of head injuries, which prevented Plaintiffs from discovering a link between their premature return to action and their head injuries.

## COUNT I
### (Negligence)

123.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges on information and belief as follows.

124.    Defendant, as purveyors of safety rules for the league, owed Plaintiffs a duty to use reasonable care in researching, studying and/or examining the dangers and risks of head injuries and/or concussions to NFL players, to inform and warn their players of such risks and to

effectuate reasonable league policies and/or take other reasonable action to minimize the risks of head injuries.

125.     Defendant affirmatively and voluntarily established the MTBI Committee to examine the dangers and consequences of head injuries to NFL players, to report on its findings, to provide information and guidance from its research and studies concerning concussions to teams and players, and to make recommendations to lessen the risks of concussions.  Defendant is responsible for the staffing and conduct of the MTBI Committee.

126.     Primarily, the Defendant NFL failed to use reasonable care in the manner in which it created the MTBI Committee and in the appointment of physicians to head the Committee who were not qualified for the job.

127.     The Defendant NFL and its MTBI Committee also failed to use reasonable care in researching, studying and/or examining the risks of head injuries and/or concussions in professional football and in downplaying and in many cases denying both the severity of such injuries and the clear link between concussions and brain damage, thereby breaching its duty to their players, including the Plaintiffs.

128.     The Defendant NFL and its MTBI Committee failed to inform, warn and/or advise their players and/or misinformed them of the risks and complications inherent in sustaining concussions, thereby breaching its duty to their players, including the Plaintiffs.

129.     The Defendant NFL and its MTBI Committee were further negligent, careless and/or grossly negligent in the following respects:

> · in failing to use reasonable care in overseeing, controlling and/or regulating policies and procedures of the league so as to minimize the risk of head injuries and/or concussions;
>
> · in failing to use reasonable care in the research and/or investigation of the concussion issue;

· in failing to appoint a qualified physician or panel of physicians to head the aforesaid MTBI committee;

· in placing a physician in charge of the committee whose primary motive was to appease the NFL rather than to report accurately;

· in disregarding independent scientific studies which showed the risks of head injuries and/or concussions to NFL players' health;

· in failing to acknowledge, either publically or to their players, the clear link between concussions and brain injuries being suffered by their players;

· in failing to acknowledge, either publically or to their players, the linkage between playing football and long-term brain injuries;

· in failing to make and/or timely make necessary league policy changes as it pertains to intentional hits to the head, hits to the head of a defenseless player, helmet to helmet hits, and concussions in general;

· in publishing misleading and erroneous findings;

· in failing to issue a timely warning, through a concussion pamphlet or other means to the players concerning the causal link between concussions and later life cognitive decline;

· in issuing misinformation and purposefully attempting to mislead their players through the concussion pamphlet which they issued in August 2007;

· in collecting and reporting upon data that was "infected" and/or not reliable;
· in causing, by and through their negligent conduct and omissions, an increased risk of harm to their players;

· in failing to provide competent information to its teams, players, coaches, trainers and medical personnel with respect to the significance of head injuries and/or concussions, their symptoms and necessary and/or proper treatment of same;

· and in creating a "culture" within the NFL in which concussions and their devastating effects would run rampant.

130.    As a direct and proximate result of Defendant's negligent, careless and/or grossly negligent conduct and omissions as aforesaid, Plaintiffs have suffered serious injury, including but not limited to brain damage with a resultant loss therefrom.

131.    That by reason of the foregoing negligence on the part of the said Defendant, Plaintiffs are informed and verily believe that their aforesaid injuries are permanent and that they will permanently suffer from the effects of their aforesaid injuries, including but not limited to continuous pain and suffering and severe emotional distress.

132.    That by reason of the foregoing, Plaintiffs were compelled and will be compelled in the future to require medical aid and attention, with a resultant cost therefrom.

133.    That by reason of the foregoing, Plaintiffs have suffered loss of opportunity of employment and will continue to suffer such loss of opportunity in the future with a resultant loss therefrom.

## COUNT II
### (Fraud)

134.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

135.    Defendant materially misrepresented the risk faced by Plaintiffs related to head injuries.  Defendant's MTBI Committee, through misleading public statements, published articles and the concussion pamphlet issued to the players, downplayed known long-term risks of concussions to NFL players.

136.    Material misrepresentations were made by members of the NFL's committee on multiple occasions, including but not limited to testimony given at congressional hearings and the "informational" pamphlet which they issued to the players.

137.    The material misrepresentations include Defendant's remarks that Plaintiffs were not at an increased risk of head injury if they returned too soon to an NFL game or training session after suffering a head injury.

138.    Defendant's material misrepresentations also included Defendant's criticism of legitimate scientific studies which illustrated the dangers and risks of head injuries.

139.    Defendant knew the misleading nature of these statements when they were made.

140.    Defendant knew, or should have known, that Plaintiffs would rely on these misrepresentations.

141.    Plaintiffs relied on these misrepresentations when playing in the NFL.  Had Plaintiffs known the risks to their health, they would not have agreed to jeopardize their health.

142.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs have suffered physical injury, including, but not limited to, memory and cognitive problems, and have suffered multiple economic losses.

## COUNT III
### (Fraudulent Concealment)

143.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

144.    Defendant's MTBI Committee concealed the risks of head injuries to Plaintiffs, and the risk to Plaintiffs if they returned to the playing field before making a proper recovery from their injuries.

145.    Defendant's MTBI Committee, through misleading public statements, published articles and the concussion pamphlet issued to players, concealed and downplayed known long-term risks of concussions to NFL players.

146.   The concussion pamphlet clearly created player reliance. The NFL stated that "[w]e want to make sure all N.F.L. players ... are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact on concussions."

147.   Further concealment of material information occurred in January 2010. Dr. Casson provided oral and written testimony at the January 2010 congressional hearings. He continued to deny the validity of other studies.

148.   Defendant failed to acknowledge, either publicly or to its players, the clear link between concussions and brain injuries beings suffered by NFL players.

149.   Defendant failed to acknowledge, either publicly or to its players, the linkage between playing football and long-term brain injuries.

150.   Defendant willfully concealed this information from Plaintiffs in order to prevent negative publicity and increased scrutiny of its medical practices.

151.   Defendant knew that Plaintiffs would rely on the inaccurate information provided by Defendant.

152.   Plaintiffs relied on this inaccurate information during their NFL careers.

153.   As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs have suffered physical injury, including, but not limited to, memory and cognitive problems, and multiple economic losses.

## COUNT IV
### (Negligent Misrepresentation)

154.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

155.    Defendant misrepresented the dangers that NFL players faced in returning to action too quickly after sustaining a head injury.  Defendant's MTBI Committee, through public statements which it knew or should have known were misleading, published articles and issued the concussion pamphlet to its players, and downplayed and the long-term risks of concussions to NFL players.

156.    Material misrepresentations were made by members of Defendant's committee on multiple occasions, including but not limited to testimony at congressional hearings and the "informational" pamphlet issued to players.

157.    The misrepresentations included Defendant's remarks that Plaintiffs were not at an increased risk of head injury if they returned too soon to an NFL game or training session after suffering a head injury.

158.    Defendant's material misrepresentations also included Defendant's criticism of legitimate scientific studies that illustrated the dangers and risks of head injuries.

159.    Defendant made these misrepresentations and actively concealed adverse information at a time when they knew, or should have known, because of their superior position of knowledge, that Plaintiffs faced health problems if he were to return to a game too soon.

160.    Defendant knew or should have known the misleading nature of these statements when they were made.

161.    Defendant made misrepresentations and actively concealed information with the intention that Plaintiffs would rely on the misrepresentations or omissions in selecting their course of action.

162.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs have suffered physical injury, including, but not limited to, memory and cognitive problems, and have suffered multiple economic losses.

## COUNT V
### (Conspiracy)

163.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

164.    Defendant actively and deliberately conspired with its team members and/or independent contractors, who were directed to continuously discount and reject the causal connection between multiple concussions suffered while playing in the NFL.

165.    This conduct between the Defendant and others was a proximate cause of the chronic injuries and damages suffered by the Plaintiffs.

**WHEFORE,** Plaintiffs demand judgment against Defendant as follows:

A.    Awarding Plaintiffs compensatory damages against Defendant in an amount sufficient to fairly and completely compensate Plaintiffs for all damages;

B.    Awarding Plaintiffs punitive damages against Defendant in an amount sufficient to punish Defendant for its wrongful conduct and to deter similar wrongful conduct in the future;

C.    Awarding Plaintiffs costs and disbursements, costs of investigations, attorneys' fees and all such other relief available under law;

D.    Awarding that the costs of this action be taxed to Defendant; and

E.    Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues.

Respectfully submitted,

Dated:  February 2, 2012

Arnold Levin (02280)
Fred S. Longer (46653)
Daniel C. Levin (80013)
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA  19106
(215) 592-1500 (phone)
(215) 592-4663 (fax)
FLonger@lfsblaw.com

Christopher A. Seeger
Moshe Horn
Christopher M. Van de Kieft
SEEGER WEISS LLP
550 Broad Street, Suite 920
Newark, New Jersey 07102
(973) 639-9100

Marc S. Albert
LAW OFFICES OF MARC S. ALBERT
32-72 Steinway St.
Astoria, NY 11103
(855) 252-3788

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Russ M. Herman
Leonard A. Davis
HERMAN, HERMAN KATZ & COTLAR
820 O'Keefe Avenue
New Orleans, Louisiana 70113
(504) 581-4892
LDavis@hhkc.com

*ATTORNEYS FOR PLAINTIFFS*